1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KENNETH JOHN ZIMMERMAN,                    No. 2:13-cv-1801-MCE-CKD P

12                 Petitioner,

13        v.                                    FINDINGS AND RECOMMENDATIONS

14   GARY SWARTHOUT,

15                 Respondent.

16

17        Petitioner, a state prisoner, is proceeding with counsel with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2010 conviction for second degree

19   murder, for which he was sentenced to a term of 15 years to life, with firearm enhancements, for

20   which he was sentenced to a consecutive term of 25 years to life.  (ECF No. 1 ("Ptn.").)

21   Respondent has filed an answer to the petition, and petitioner has filed a traverse.  (ECF Nos. 15,

22   17.)  Upon careful consideration of the record and the applicable law, the undersigned will

23   recommend that the petition be denied.

24   /////

25   /////

26   /////

27   /////

28   /////

1

BACKGROUND

I.     Facts

In its affirmation of the judgment on appeal, the California Court of Appeal, Third

Appellate District, set forth the relevant factual background as follows:

I

The Prosecution's Case

Defendant and O'Sullivan lived on adjacent parcels of land on Jura Lane in rural Amador County. The access road to defendant's residence ran across O'Sullivan's property, which was subject to an easement. Over the years, there were numerous disputes between defendant and O'Sullivan over a gate maintained by O'Sullivan on the access road.

On August 16, 2009, defendant saw a group of people at a pond on O'Sullivan's property near the common gate. Believing O'Sullivan and his family had abandoned the property, defendant confronted the group regarding their presence there. O'Sullivan's wife, who was part of the group, told defendant that the other individuals were her guests and that he had no business yelling at them. Defendant responded that she and her family were going to lose the property and that it would soon be his. He then left.

When O'Sullivan's wife returned home, she told O'Sullivan about her encounter with defendant. Later that evening, after consuming a few beers, O'Sullivan left his home and drove his Kubota tractor three-quarters of a mile up the access road and onto defendant's property, crashing through defendant's gate in the process. Hearing the commotion, defendant emerged from his home carrying a handgun and watched as O'Sullivan rammed into a woodpile located approximately 81 feet from defendant's front door. According to defendant, defendant asked O'Sullivan what he was doing, and O'Sullivan backed up, punched defendant in the face, and ran over defendant's feet. Defendant fired three shots at O'Sullivan as O'Sullivan was leaving.[ FN 2] All three shots struck O'Sullivan. One of the shots entered O'Sullivan's body above his left nipple and passed through his heart. Another shot struck O'Sullivan in the back, perforated his left lung, and stopped near his heart. A third shot entered O'Sullivan's back, and hit both of his lungs, his heart, and his aorta. Any one of the wounds "would have been easily fatal in and of itself."

[FN 2]: Following the shooting, defendant told law enforcement that he fired two shots; at trial, however, he did not dispute the prosecution's evidence that he actually fired three shots.

At 7:42 p.m., defendant telephoned 911 and reported that his neighbor "just blew through my gate with his tractor and tried to run me over" and "destroyed some stuff." He also stated that O'Sullivan "whacked me in the face and broke my glasses." He told the dispatcher, "You better get up here or I'm gonna...." The

2

dispatcher advised defendant, "[W]e're going to get everybody out there, try and stay away from him, where'd he go?" Defendant responded, "I'm going to go after him right now." When the dispatcher again told defendant to stay away from O'Sullivan, defendant said, "Better hurry before I shoot his ass."

At 7:46 p.m., Amador County Sheriff's Deputy Dustin MacCaughey was dispatched to defendant's address where he met Deputy Todd Smith. The dispatcher erroneously advised MacCaughey that defendant stated that he was going to go to O'Sullivan's home and shoot him. As MacCaughey and Smith proceeded up the access road off of Jura Lane, MacCaughey saw defendant standing near the rear of a pickup truck, which was blocking the road. MacCaughey immediately handcuffed defendant for "officer safety," then left to look for O'Sullivan, while Smith remained with defendant.

At approximately 8:15 p.m., MacCaughey noticed that a significant portion of a barbed wire fence had been damaged and got out of his patrol car to investigate. He walked through the brush and found O'Sullivan slumped over the controls of his tractor; O'Sullivan was dead. MacCaughey radioed Smith and told him to place defendant in the back of Smith's patrol car and not to talk to defendant.

At approximately 10:45 p.m., Sergeant Brian Middleton with the investigations bureau arrived at the scene and spoke with defendant, who was seated in the backseat of a patrol car. Defendant told Middleton that O'Sullivan crashed through defendant's gate, came in front of defendant's house, and "started destroying shit with his Kubota [tractor]." Defendant ran outside with his pistol, got right next to the tractor, and said, "What the fuck are you doing?" O'Sullivan "whacked" defendant in the side of the head with his left fist and ran over defendant's feet. Defendant fired his pistol and ran inside and telephoned 911. Defendant then telephoned the owner of the property and said, "Get your goddamn lawyer on speed dial, we're going for it." Next, defendant drove his ranch truck to block the access road because O'Sullivan "likes to ... hit and run." Defendant did not know if he hit O'Sullivan when he fired the shots. When asked if the tractor moved after he fired the shots, defendant responded, "[O'Sullivan] was heading over the cattle guard...." When asked if O'Sullivan was facing defendant when defendant fired the shots, defendant said, "He was going away. [¶] ... [¶] ... He was—he was almost over my cattle guard in front of the house." Defendant explained that "[t]his has been ongoing for the last seven years" and asked "what they gonna do to the asshole." Middleton asked defendant if he had "any idea what started this off tonight," and defendant said that when he returned home around 5:00 p.m., he saw "a bunch of Mexicans fishing" on O'Sullivan's property. O'Sullivan and his wife were "in foreclosure" and the property had been abandoned for two months; thus, defendant wondered, "What the hell is going on here?" Defendant asked the people at the pond, "Hey, who are you?" He also told them, "This is private property." At that point, O'Sullivan's wife began yelling, and defendant said, "Ah, forget it," and went home. Two or three hours later, defendant heard his gate "being crashed."

3

Middleton took photographs of defendant's feet, hands, and face, and tested defendant's hands for gunshot residue. Middleton observed injuries to the bottoms of defendant's feet and a small mark on defendant's head.

The next day, August 17, 2009, Middleton interviewed defendant at the jail. Defendant's version of events leading up to and following the shooting was basically the same as the one he gave to Middleton at the scene, with a few variations and additions. Defendant stated that after O'Sullivan struck the woodpile, O'Sullivan "backed up, and I went to the side, and that's when he clocked me in the side of the head with his left hand, ran my feet over, and then he started taking off—well—with my feet under the tire, and that's when I cut loose two shots." When asked how far away he was from O'Sullivan when he fired the shots, defendant responded 12 to 15 feet. When asked if he could see O'Sullivan's face when he fired the shots, defendant said, "No, cuz he was hauling ass out." When asked where O'Sullivan was going, defendant stated, "He was getting off— the front of my house, going over the cattle guard, probably going back down Jura Lane." Later, defendant said he "took two shots off when [O'Sullivan] was heading towards the cattle guard." Middleton asked, "But when you shot, he was leaving," and defendant responded, "Yes. [¶] ... [¶] ... [A]fter he ran my feet over—[¶] ... [¶] ...—then he was headed toward the cattle guard right in front of the house...." Middleton also asked defendant where he was aiming when he fired, and defendant said, "Just at him. Just at him." Defendant explained that he had the gun for "home protection," and that he had never fired it before that night. Defendant added, "I figured my life was in danger when the son-of-a-bitch was coming at me with a tractor."

On August 17, 2009, Middleton also searched defendant's home and found a pair of eyeglasses. The glasses did not appear to be bent or broken in any manner. Detectives also located the .25–caliber Ravens Arms pistol used by defendant. There were no identifiable finger prints on the weapon, just one unidentifiable print that did not belong to defendant. Detectives also recovered a .25–caliber shell casing in front of defendant's residence. A few months later, in November 2009, a second .25–caliber casing was recovered between the cattle guard and defendant's residence, and in December 2009, a third casing was found near the cattle guard. It was later determined that the casing found near defendant's residence was ejected from defendant's weapon; the two other casings, which were bent and corroded, could not be associated with this case.

Margaret Kaleuati, a senior criminalist with the Los Angeles County Coroner's Office and an expert in gunshot residue, analyzed the gunshot residue test kit administered by Middleton and found no gunshot residue particles on the samples taken from defendant's hands. She explained that the absence of gunshot residue could be caused by defendant wiping his hands on another surface, washing his hands, or by "friction action" from normal activity.

Tire tracks matching O'Sullivan's tractor confirmed that O'Sullivan had driven his tractor past defendant's gate, and up near defendant's residence. O'Sullivan drove over the cattle guard, into defendant's pickup truck, then backed

4

up away from the residence in the direction of the woodpile. O'Sullivan then apparently backed up and proceeded to the cattle guard. The tracks resumed again heading down defendant's drive, in the direction of the damaged fence where MacCaughey located O'Sullivan's body on the tractor. The tractor never came closer than 52 feet from defendant's residence. Damages to defendant's gate and truck were consistent with being struck by the bucket of O'Sullivan's tractor.

Defendant was taken to the hospital prior to being booked into jail. A triage nurse described the wounds to defendant's feet as consistent with "friction burn" and inconsistent with being crushed. The nurse did not see any bruising or lacerations on the tops of defendant's feet and noted that he walked normally, without assistance. Defendant described his pain level as "zero" on a scale of zero to 10, with zero being no pain and 10 being "the worst pain in your life." The nurse treated defendant's injuries by cleaning his feet and applying an antibiotic ointment and a bandage.

An emergency room doctor also examined defendant's feet and observed some bruising and a blister abrasion on the bottom of defendant's left foot, and significant bruising on the bottom of defendant's right foot at the great and second toes. He did not observe any injury to the top of defendant's right foot. The doctor was "underwhelmed" by the injuries to defendant's feet given defendant's claim that his feet had been run over by a tractor but said it was conceivable that the injuries were caused by a tractor running over defendant's feet. The doctor did not observe any limping, and defendant did not complain to him that his feet hurt.

O'Sullivan had a blood alcohol level of 0.159 percent. Decomposition may cause the blood alcohol level to increase; however, the toxicologist who analyzed O'Sullivan's blood sample was unable to determine what percentage of the blood alcohol result was due to the consumption of alcohol and what percentage was due to decomposition.

II

The Defense

Defendant lived on the property on Jura Lane for a number of years. The property was owned by Ted Sakaida. Shortly after O'Sullivan moved onto the adjoining parcel, a dispute arose over O'Sullivan's desire to construct a gate across the access road used by Sakaida to access his property. Sakaida and O'Sullivan discussed ways of preventing O'Sullivan's livestock from leaving the property while still insuring defendant and Sakaida had access to Sakaida's parcel. Sakaida initially prepared to install a cattle guard, however, O'Sullivan would not allow it, telling him, "don't put that thing in there or else." When Sakaida asked O'Sullivan what he meant by "or else," O'Sullivan replied, "You'll find out." Ultimately O'Sullivan installed a gate, which became a constant source of contention.

Deputy Smith testified that he and Deputy MacCaughey were the first law enforcement personnel to arrive at the scene. Smith remained with defendant while

MacCaughey went to look for O'Sullivan. In an attempt to assist MacCaughey in locating O'Sullivan, Smith asked defendant, "Where did you shoot, left or right?" Defendant responded, "Inside my gate, another three-quarters of a mile up the road." Smith then asked, "Up which way, to the right or to the left?" Defendant responded, "To the left."

Various friends and family members testified as to defendant's honesty and good nature. While they were aware of defendant's conflicts with O'Sullivan, they never heard defendant threaten O'Sullivan or express any desire to harm him. Other witnesses recounted negative encounters with O'Sullivan, describing his behavior as aggressive and belligerent.

Dr. David Lechuga, a neuropsychologist, testified that defendant had strong visual and spatial acuity, but that he had relatively weak verbally mediated skills. Thus, "his ability to recall things visually is probably going to be better than his ability to describe what he saw or learned verbally." In a stressful situation, such as a shooting, defendant's account of events, even if absolutely truthful, would likely be flawed.

Dr. Craig Lareau, a psychologist, explained that in extremely stressful situations, the body's limbic system responds by releasing hormones and chemicals, the "flight or fight" mechanism, in order to cope and respond to the situation. This reaction dims the higher functioning and reasoning processes so that a person does not slow his or her reaction by over-thinking the situation. Short term memory is shut down, while images and stimuli are stored in longer term memory for later access. Dr. Lareau would not expect a witness to a stressful, life-threatening event to be a good historian of the events while still under the influence of the limbic system response chemicals. He opined that the stress of the encounter with O'Sullivan would account for defendant's failure to mention shooting at O'Sullivan to the 911 dispatcher.

With respect to O'Sullivan's 0.159 percent blood alcohol level, a pathologist testified that while textbooks state that decomposition may increase blood alcohol levels up to 0.05 percent, he had never seen blood alcohol levels increase more that 0.03 percent after extensive decomposition.

An accident reconstruction engineer testified that the spacing of the tire lugs (the portion of the tire that actually touches the ground) was such that a foot could come into contact with the wall of the tire itself, which would cause less damage. He also opined that based on the trajectories, lack of stippling, the gradient of the terrain, and the relative heights of defendant and O'Sullivan, the most likely scenario is that defendant was five feet from O'Sullivan when he shot him.

////

6

1 Lodged Document ("Lod. Doc.") 20 at 2-9, also at <u>People v. Zimmerman</u>, 2013 WL 870647 (Cal.

2 App. 3 Dist. March 11, 2013).[1]  The facts as set forth by the state court of appeal are presumed

3 correct, 28 U.S.C. §2254(e)(1), and are consistent with this court's review of the record.

4 II.      Procedural History

5          Following a jury trial in the Amador County Superior Court, petitioner was convicted of

6 second degree murder.[2]  The jury additionally found the charged firearm enhancements to be

7 true.[3]  The trial court imposed an aggregate term of 40 years to life, consisting of 15 years to life

8 for second degree murder, and a consecutive 25 years to life on the section 12022.53, subdivision

9 (d), enhancement.  Lod. Doc. 20 at 2.  Petitioner's sentence on the section 12022.5, subdivision

10 (a), enhancement was stayed.  <u>Id.</u>

11         Petitioner appealed the judgment to the California Court of Appeal, Third Appellate

12 District.  Lod. Docs. 17-19.  On appeal, he argued that the trial court committed various

13 evidentiary and instructional errors.  <u>Id.</u>  On March 11, 2013, the appellate court rejected

14 petitioner's claims on the merits and affirmed his sentence.  Lod. Doc. 20.

15         Petitioner filed a petitioner for review in the California Supreme Court.  Lod. Doc. 21.

16 On June 12, 2013, the California Supreme Court denied review.  Lod. Doc. 22.

17         Petitioner filed the instant federal habeas petition on August 29, 2013.  Ptn.  Respondent

18 filed an answer on December 30, 2013.  ECF No. 15.  Petitioner filed a traverse on January 7,

19 2014.  ECF No. 17.

20                                              ANALYSIS

21 I.      AEDPA

22         The statutory limitations of federal courts' power to issue habeas corpus relief for persons

23 in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

24 Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

25 ////

26 _____

[1] Lodged documents refer to documents lodged by respondent on December 30, 2013.  (ECF No.
27 16.)
[2] Cal. Penal Code § 187, subd. (a).
28 [3] Cal. Penal Code § 12022.53, subd. (d); § 12022.5, subd. (a)(1).

1

2

3

       An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

4

5

       (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

6

7

       (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

8

9       As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

10  2254(d) does not require a state court to give reasons before its decision can be deemed to have

11  been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

12  Rather, "when a federal claim has been presented to a state court and the state court has denied

13  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

14  of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris

15  v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear

16  whether a decision appearing to rest on federal grounds was decided on another basis).  "The

17  presumption may be overcome when there is reason to think some other explanation for the state

18  court's decision is more likely."  Id. at 785.

19       The Supreme Court has set forth the operative standard for federal habeas review of state

20  court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an unreasonable

21  application of federal law is different from an incorrect application of federal law.'"  Harrington,

22  supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410 (2000).  "A state court's

23  determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

24  jurists could disagree' on the correctness of the state court's decision."  Id. at 786, citing

25  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Accordingly, "a habeas court must

26  determine what arguments or theories supported or . . . could have supported[] the state court's

27  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

28  arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id.

1  "Evaluating whether a rule application was unreasonable requires considering the rule's

2  specificity.  The more general the rule, the more leeway courts have in reaching outcomes in

3  case-by-case determinations.'"  Id.  Emphasizing the stringency of this standard, which "stops

4  short of imposing a complete bar of federal court relitigation of claims already rejected in state

5  court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not

6  mean the state court's contrary conclusion was unreasonable."  Id., citing Lockyer v. Andrade,

7  538 U.S. 63, 75 (2003).

8      The undersigned also finds that the same deference is paid to the factual determinations of

9  state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

10  subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

11  decision that was based on an unreasonable determination of the facts in light of the evidence

12  presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

13  2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

14  factual error must be so apparent that "fairminded jurists" examining the same record could not

15  abide by the state court factual determination.  A petitioner must show clearly and convincingly

16  that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338 (2006).

17  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable

18  nature of the state court decision in light of controlling Supreme Court authority.  Woodford v.

19  Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state court's ruling

20  on the claim being presented in federal court was so lacking in justification that there was an error

21  well understood and comprehended in existing law beyond any possibility for fairminded

22  disagreement."  Harrington, supra, 131 S. Ct. at 786-787.  Clearly established" law is law that has

23  been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten, 552 U.S.

24  120, 125 (2008).  Thus, extrapolations of settled law to unique situations will not qualify as

25  clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not

26  permitting state sponsored practices to inject bias into a criminal proceeding by compelling a

27  defendant to wear prison clothing or by unnecessary showing of uniformed guards does not

28  qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

9

1   The established Supreme Court authority reviewed must be a pronouncement on constitutional

2   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

3   binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

4          The state courts need not have cited to federal authority, or even have indicated awareness

5   of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8.  Where the state

6   courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal

7   court will independently review the record in adjudication of that issue.  "Independent review of

8   the record is not de novo review of the constitutional issue, but rather, the only method by which

9   we can determine whether a silent state court decision is objectively unreasonable."  Himes v.

10  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

11         "When a state court rejects a federal claim without expressly addressing that claim, a

12  federal habeas court must presume that the federal claim was adjudicated on the merits – but that

13  presumption can in some limited circumstances be rebutted."  Johnson v. Williams, 133 S. Ct.

14  1088, 1096 (2013).  "When the evidence leads very clearly to the conclusion that a federal claim

15  was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of

16  the claim.  Id. at 1097.

17  II.    Petitioner's Claims

18         A.    Denial of Portions of a Recorded Statement Petitioner Made to Sheriff's Deputy

19              Smith at the Crime Scene

20         First, petitioner claims that the state courts unreasonably denied him the right to present to

21  the jury the entirety of a recorded statement he made to Sheriff's Deputy Todd Smith just after

22  Deputy Smith arrived at petitioner's address on the evening of August 16, 2009.  Petitioner argues

23  that while the trial court permitted the introduction of a portion of the recorded statement, it

24  improperly prevented petitioner from introducing the remaining portion of the recorded statement

25  that contained petitioner's version of what happened when the victim had driven his tractor onto

26  petitioner's land and showed petitioner's state of mind at the time, which petitioner claims

27  supported his claim of self-defense.  Petitioner's trial counsel attempted to introduce these

28  additional portions of the recording into evidence, but the trial court sustained the prosecution's

10

objection that this evidence was impermissible hearsay and excluded it.  Petitioner argues that the state trial court's refusal to allow him to present this evidence to the jury during his criminal trial violated his Fourteenth Amendment right to due process, Sixth Amendment Confrontation Clause right to confront his accusers, and Fifth Amendment right to remain silent.

> ### 1.   State Court Decision

In affirming the trial court's ruling denying the introduction of the entirety of petitioner's recorded statement to Deputy Smith at the crime scene, the Third Appellate District wrote:

> The Trial Court Did Not Abuse Its Discretion in Declining to Admit the Entirety of Defendant's Conversation with Deputy Smith at the Scene

> Defendant next contends the trial court erred in excluding "defense evidence of [defendant's] complete statement to sheriff's deputies who first responded to the crime scene." He argues the statement was admissible as a spontaneous statement (Evid. Code, § 1240), or alternatively as a prior consistent statement (*id.*, §§ 791, 1236). He is mistaken.

> Deputies Smith and MacCaughey were the first to arrive at the scene. Smith had a tape recorder affixed to his duty belt that recorded the events as they happened. Smith remained with defendant while MacCaughey went to find O'Sullivan, and defendant's statements during that time were recorded. In the recording, MacCaughey can be heard telling Smith, "[S]ee if you can get an exact location of where [defendant] shot at [O'Sullivan]." The following colloquy ensued:

> > "DEPUTY: Where did you shoot, left or right?
> > "[¶] ... [¶]

> > "[DEFENDANT]: Inside my gate, another three-quarters of a mile up the road.

> > "DEPUTY: Up which way, to the right or to the left? There's two—

> > "[DEFENDANT]: To the left. To the left."

> In addition, defendant can be heard stating that O'Sullivan "blew through the gate and started beating the shit out of some of my property...." Defendant ran outside, "[g]ot next to the tractor and [O'Sullivan] ran over my feet, whacked me in the side of the face," and "broke my other glasses." Defendant "took two shots." He did not know whether he hit O'Sullivan. O'Sullivan was heading towards defendant's gate when defendant shot at him.

> At trial, the defense was permitted to play the portion of the recording

11

during which defendant responded to questions concerning defendant's location when he shot at O'Sullivan. The defense also sought to play the entire recording for the jury, asserting that defendant's additional statements to Smith about "what had happened at the residence prior to the shooting" were consistent with statements he later made to Middleton, and thus, were necessary to refute the prosecution's assertion that defendant fabricated the story he told to Middleton later that evening and the following day. Defendant argued his statements to Smith were admissible as spontaneous statements and as prior consistent statements. The prosecution objected on hearsay grounds, arguing the statements "did not fit within the parameters of an excited utterance, as a substantial period of time had passed." Moreover, according to the prosecution, "It is a change in story from the 911 call, which can also show that he had time to think about it." The trial court sustained the prosecution's objection, finding "most of [defendant's] responses, although they certainly exceed the subject matter of the question posed by Deputy Smith, are simply responses to questions and in the court's opinion do not rise to the level of spontaneous statements or utterances."

We review the trial court's ruling for abuse of discretion. (*People v. Ledesma* (2006) 39 Cal.4th 641, 708; *People v. Waidla*, *supra*, 22 Cal.4th at p. 725; *People v. Welch* (1972) 8 Cal.3d 106, 117.) None appears here.

To qualify as "spontaneous" under Evidence Code section 1240, a statement must have been made "'before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance.'" (*People v. Thomas* (2011) 51 Cal.4th 449, 495, quoting *People v. Poggi* (1988) 45 Cal.3d 306, 318.) Here, defendant's statements were not made before he had time to contrive and misrepresent. At least 33 minutes elapsed between the time defendant telephoned 911 and the time he was contacted by Smith and MacCaughey. Accordingly, the trial court did not abuse its discretion in refusing to admit his statements on this ground.

To qualify as a prior consistent statement, a statement previously made by a witness must be "*consistent* with his testimony at the hearing ...." (Evid. Code, § 1236, italics added.) "The hearing," as used in the Evidence Code means "the hearing at which a question under this code arises, and not some earlier or later hearing." (Evid. Code, § 145.) Here, the question arose at trial. Defendant, however, did not testify at trial; accordingly, his statements to Deputy Smith at the scene were not admissible as prior consistent statements under Evidence Code section 1236. (*People v. Hitchings* (1997) 59 Cal.App.4th 915, 921–922.)

Defendant asserts for the first time in his reply brief that his statements were admissible under "Evidence Code [section] 356, which requires that the whole of a statement be introduced once a portion is introduced" and as a prior inconsistent statement under Evidence Code section 1202. We need not entertain these assertions because they were made for the first time in a reply brief. (*People v. Tully*, *supra*, 54 Cal.4th at p. 1075.) Moreover, neither of these grounds was raised in the trial court, and thus, has been forfeited. [FN 3] (Evid. Code, § 353.) In

12

any event, they fail on the merits.

> [FN 3]: To the contrary, in response to the prosecutor's argument that the statements "could not be used under the doctrine of completeness," defendant's trial counsel insisted that he had not "offered them as [Evidence Code, section] 356, but only as spontaneous or prior consistent statements."

Evidence Code section 356 provides in pertinent part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an *adverse party* ...." (Italics added.) "The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." (*People v. Arias* (1996) 13 Cal.4th 92, 156.) Under Evidence Code section 356, *the prosecution*, as the adverse party, had the right to inquire into "the whole *on the same subject*," i.e. defendant's location at the time he shot at O'Sullivan. (Italics added.) Defendant argues that because the trial court allowed him to introduce a portion of the recording, he was entitled to introduce the entire recording. That is not what Evidence Code section 356 allows. Accordingly, the entirety of the recording was not admissible under Evidence Code section 356.

Evidence Code section 1202 provides in pertinent part: "Evidence of a statement ... by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct." In *People v. Baldwin* (2010) 189 Cal.App.4th 991, cited by defendant, the court found that where the prosecution introduced the defendant's statements in a jail recording as party admissions (Evid. Code, § 1220), "by its plain language, [Evidence Code] section 1202 permitted [the defendant] to introduce his prior inconsistent statements to attack his own credibility as a hearsay declarant in the jail recordings, even though he was able to testify." (*People v. Baldwin*, *supra*, 189 Cal.App.4th at p. 1003) Here, as in *People v. Baldwin*, defendant's statements to Sergeant Middleton were admissible as statements of a party opponent (Evid. Code, § 1220). As defendant acknowledges, however, unlike that case, his statements to Deputy Smith at the scene were consistent with his statements to Sergeant Middleton. Thus, they are not admissible under Evidence Code section 1202. Contrary to defendant's assertion, his statements to Smith are not made admissible because they are inconsistent with the prosecution's theory that defendant fabricated his statements to Sergeant Middleton. The statute plainly applies to statements that are "inconsistent with a *statement*," not an adverse party's theory or interpretation of a statement. (Evid. Code, § 1202, italics added.)

The trial court did not abuse its discretion in not admitting the tape recording of defendant's statements to Deputy Smith in its entirety.

1  Lod. Doc. 20 at 18-22, also at <u>People v. Zimmerman</u>, 2013 WL 870647 (Cal. App. 3 Dist. March

2  11, 2013).

3       2.  <u>Discussion</u>

4         a.  <u>Failure to Exhaust State Court Remedies</u>

5     As an initial matter, respondent argues that petitioner's claim that the trial court's

6  evidentiary ruling denying the admission of this evidence violated petitioner's Fifth Amendment

7  right to remain silent has not been properly exhausted and, therefore, should be denied.

8  Specifically, respondent asserts that petitioner never properly raised this claim in the state courts

9  until his final appeal to the California Supreme Court, therefore failing to exhaust this claim

10  before presenting it for federal habeas review.  This argument is well taken.

11     Under 28 U.S.C. § 2254(b)(1)(A), a habeas petitioner first must exhaust his state court

12  remedies on a claim before presenting that claim to the federal courts.  To satisfy this exhaustion

13  requirement, the claim must have been fairly presented to the state courts completely through to

14  the highest court available, in this case the California Supreme Court.  <u>E.g.</u>, <u>Peterson v. Lampert</u>,

15  319 F.3d 1153, 1156 (9th Cir. 2003)( en banc ) ("A petitioner must exhaust his state remedies by

16  reaching the point where he has no state remedies available to him at the time he files his federal

17  habeas petition."); <u>Vang v. Nevada</u>, 329 F.3d 1069, 1075 (9th Cir. 2003).  In the state courts, the

18  petitioner must refer to the specific federal constitutional guarantee and must also state the facts

19  that entitle the petitioner to relief on the federal constitutional claim. <u>E.g.</u>, <u>Shumway v. Payne</u>,

20  223 F.3d 983, 987 (9th Cir. 2000).  That is, fair presentation requires that the petitioner present

21  the state courts with both the operative facts and the federal legal theory upon which his claim is

22  based.  <u>E.g.</u>, <u>Castillo v. McFadden</u>, 399 F.3d 993, 999 (9th Cir. 2005). "[T]o exhaust a habeas

23  claim, a petitioner must properly raise it on every level of direct review."  <u>Casey v. Moore</u>, 386

24  F.3d 896, 916 (9th Cir. 2004); <u>see also</u> <u>Castille v. Peoples</u>, 489 U.S. 346, 351 (1989) (holding that

25  a claim remains unexhausted for lack of "fair presentation" where it was raised for the first time

26  on discretionary review to the state's highest court and denied without comment).  The exhaustion

27  requirement insures that the state courts, as a matter of federal-state comity, will have the first

28  opportunity to pass upon and correct alleged violations of federal constitutional guarantees.  <u>See</u>,

1    e.g., Coleman v. Thompson, 501 U.S. 722, 731 (1991).

2            Here, it is clear that petitioner did not present a claim based on a violation of his Fifth

3    Amendment right to remain silent in his briefing before the California Court of Appeal.[4]  See

4    Lod. Doc. 17 at 66-74.  Rather, he presented a claim based on this particular alleged

5    constitutional violation for the first time on his petition for review filed in the California Supreme

6    Court.  See Lod. Doc. 21 at 16.  Raising this claim for the first time on discretionary review to the

7    state's highest court was insufficient to meet the exhaustion requirement under 28 U.S.C. §

8    2254(b)(1)(A).  See Casey, 386 F.3d at 916.  Plaintiff's assertion in his traverse that the court can

9    presume that the California Court of Appeal adjudicated this claim even though it did not

10   expressly discuss that claim in its opinion under the United States Supreme Court's ruling in

11   Johnson v. Williams, 133 S. Ct. 1088, 1095 (2013) is without merit because, unlike in Johnson,

12   petitioner never fairly presented his right to remain silent claim in his briefing to the state

13   appellate court.  Accordingly, petitioner's claim based on the Fifth Amendment right to remain

14   silent has not been properly exhausted and, therefore, should be denied.

                            b.        Procedural Default

16           Second, respondent argues that to the extent petitioner's claims concerning the exclusion

17   of the recorded statement are premised on arguments that the trial court improperly declined to

18   admit the evidence under California Evidence Code sections 356 or 1202, such claims are

19   procedurally defaulted because the Third Appellate District denied these claims on independent

20   and adequate state procedural grounds.  Respondent's argument is meritorious.

21           The procedural default doctrine forecloses federal review of a state prisoner's federal

22   habeas claims if those claims were defaulted in state court pursuant to an independent and

23   adequate state procedural rule.  See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).

24   Generally, "federal habeas relief will be unavailable when (1) 'a state court [has] declined to

25   address a prisoner's federal claims because the prisoner had failed to meet a state procedural

---

[4] Indeed, petitioner's briefing in his appeal before the Third Appellate District argues only that his "federal constitutional rights to due process, compulsory process, and confrontation" were violated by the trial court when it prevented him from presenting the full recorded statement. Lod. Doc. 17 at 66.

1    requirement,' and (2) 'the state judgment rests on independent and adequate state procedural

2    grounds,'" Walker v. Martin, 562 U.S. 307, 316 (2011) (quoting Coleman, 501 U.S. at 729-30).

3    A state procedural rule is "adequate" only if it is clear, consistently applied, and well established

4    at the time of petitioner's default. Walker, 562 U.S. at 316; Calderon v. United States Dist.

5    Court, 96 F.3d 1126, 1129 (1996). The respondent bears the burden of proof with respect to the

6    "adequacy" of a state procedural bar. Bennett v. Mueller, 322 F.3d 573, 585-86 (9th Cir. 2003).

7    "[A] procedural default does not bar consideration of a federal claim on either direct or habeas

8    review unless the last state court rendering a judgment in the case 'clearly and expressly' states

9    that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989).

10   Furthermore, a federal habeas court may still consider the merits of an otherwise procedurally

11   defaulted claim if the petitioner successfully makes a showing of "cause" and "prejudice."

12   Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012) ("A prisoner may obtain federal review of a

13   defaulted claim by showing cause for the default and prejudice from a violation of federal law.").

14        In this action, to determine whether petitioner's claim was procedurally barred, the court

15   looks to the opinion issued by the California Court of Appeal, Third Appellate District because it

16   is the last reasoned state court opinion. Vansickel v. White, 166 F.3d 953, 957 (9th Cir. 1999)

17   (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Here, the California Court of Appeal

18   held that petitioner had procedurally forfeited any claims he may have had based on California

19   Evidence Code sections 356 or 1202 with regard to the recorded statement because he failed to

20   raise such arguments in the trial court and only raised them for the first time on appeal in his reply

21   brief. Lod. Doc. 20 at 21. This was an independent state procedural ground for denying

22   petitioner's claim that was well established and consistently applied in California's courts. See

23   People v. Tully, 54 Cal. 4th 952, 1075 (2012) ("For the first time in his reply brief, defendant

24   attempts to specify 11 claims as to which the absence of transcripts prevented meaningful

25   appellate review. It is axiomatic that arguments made for the first time in a reply brief will not be

26   entertained because of the unfairness to the other party."). Accordingly, petitioner's claims

27   regarding the recorded statement should be denied as procedurally defaulted to the extent they are

28   premised on arguments concerning California Evidence Code sections 356 and 1202.

1

c.      Remaining Claims Regarding the Statement Evidence

2       Finally, respondent argues that petitioner's remaining claims that the trial court's refusal

3  to admit the full recorded statement violated his constitutional due process and confrontation

4  rights lack merit.  This argument is well taken.

5

i.      Due Process

6       Absent some federal constitutional violation, a violation of state law does not provide a

7  basis for habeas relief.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Accordingly, federal

8  court may not grant habeas relief based on a belief that the state trial court made an incorrect

9  evidentiary ruling under state evidence law.  Briceno v. Scribner, 555 F.3d 1069, 1077 (9th Cir.

10  2009) (citing Estelle, 502 U.S. at 67-68) ("Our habeas powers do not allow us to vacate a

11  conviction 'based on a belief that the trial judge incorrectly interpreted the California Evidence

12  Code in ruling' on the admissibility of evidence.").  A state court's evidentiary ruling, even if

13  erroneous, is grounds for federal habeas relief only if it is clearly prejudicial and renders the state

14  proceedings so fundamentally unfair so as to violate due process.  Drayden v. White, 232 F.3d

15  704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Jammal v. Van

16  de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  In essence, habeas relief must be granted when the

17  error "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht

18  v. Abrahamson, 507 U.S. 619, 623 (1993) (internal quotations omitted).

19       Here, petitioner argues that the state court's refusal to admit the entire recorded statement

20  violated his right to due process because it prevented him from using these statements to rebut

21  petitioner's statements to investigators that were proffered by the prosecution to support its theory

22  that petitioner had fabricated his version of the events.  Petitioner also argues that the recorded

23  statement would have supported a later statement he had made regarding his version of the events

24  surrounding the shooting incident.  However, even assuming for the sake of argument that the

25  trial court erred by preventing petitioner from admitting the whole recorded statement to the jury,

26  it cannot be said that this error "had substantial and injurious effect or influence in determining

27  the jury's verdict."  Brecht, 507 U.S. at 623.  Generally, in a federal habeas proceeding the court

28  will "assess whether the improper exclusion of evidence violated due process by examining the

17

1   probative value of the evidence on the central issue; its reliability; whether it is capable of

2   evaluation by the trier of fact; whether it is the sole evidence on the issue or merely cumulative;

3   and whether it constitutes a major part of the attempted defense." Drayden v. White, 232 F.3d

4   704, 711 (9th Cir. 2000) (quotation marks omitted).  As petitioner notes, he sought to introduce

5   the recorded statement in order to further prove that his story was credible because it was

6   consistent with other statements he had made that had already been introduced into evidence.

7   Therefore, the probative core of the recorded statement, i.e., petitioner's version of the events,

8   was largely cumulative of other evidence already proffered to the jury.  Furthermore, while

9   admission of the entire recorded statement might have possibly bolstered petitioner's version of

10  events in the eyes of the jury, it is unreasonable to assume that it certainly would have swayed the

11  jury to such a degree as to impact their verdict.  Even with the admission of this statement, there

12  was sufficient evidence upon which the jury could determine that petitioner's version of the

13  events was false.  Accordingly, petitioner fails to demonstrate that right to due process was

14  violated by the state court's omission of this evidence.  Therefore, this claim should be denied.

15                                  ii.     Confrontation

16        The Sixth Amendment to the United States Constitution grants a criminal defendant the

17  right "to be confronted with the witnesses against him."  U.S. Const. amend. VI. "The 'main and

18  essential purpose of confrontation is to secure for the opponent the opportunity of cross-

19  examination.'"  Fenenbock v. Director of Corrections for California, 692 F.3d 910, 919 (9th

20  Cir.2012) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986)).  The Confrontation

21  Clause applies to the states through the Fourteenth Amendment.  Pointer v. Texas, 380 U.S. 400,

22  406 (1965).  In Crawford v. Washington, 541 U.S. 36 (2004), the United States Supreme Court

23  held that the Confrontation Clause bars the prosecution from introducing into evidence out-of-

24  court statements made by non-testifying individuals which are "testimonial" in nature unless the

25  defendant has the opportunity to confront and cross-examine that individual with respect to that

26  testimonial evidence.  However, not all hearsay implicates the core concerns of the Confrontation

27  Clause; the dispositive question is whether the statement is "testimonial."  Crawford, 541 U.S. at

28  51.  Generally, "testimonial" statements are "live out-of-court statements against a defendant

                                         18

1    elicited by government officer with a clear eye to prosecution." United States v. Cervantes-

2    Flores, 421 F.3d 825, 833-34 (9th Cir. 2005), cert. denied, 547 U.S. 1114 (2006).  The United

3    States Supreme Court has held that a statement is non-testimonial when it is made to law

4    enforcement with the "primary purpose [of] enable[ing] police assistance to meet an ongoing

5    emergency." Davis v. Washington, 547 U.S. 813, 828 (2006).

6         Here, the recorded statement petitioner sought to introduce was clearly non-testimonial.

7    The record demonstrates that petitioner made these statements to Deputy Smith soon after the

8    deputy sheriffs arrived at the scene, and while the deputies were still trying to ascertain the

9    victim's location and how events had transpired prior to their arrival.  These surrounding

10   circumstances indicate that the primary purpose behind petitioner's recorded statement to Deputy

11   Smith was to enable the sheriff's deputies at the scene to respond to an ongoing emergency, i.e.,

12   finding the recently shot victim.  See Davis v. Washington, 547 U.S. 813, 828 (2006).  Moreover,

13   the Confrontation Clause requires only that a court *not admit* testimonial out-of-court statements

14   by an unavailable individual that the prosecution seeks to introduce *against* the criminal

15   defendant.  See Crawford, 541 U.S. 36.  In this case, petitioner argues that the trial court should

16   have *admitted* these statements he made to Deputy Smith, which the *defense* was seeking to

17   introduce.  Accordingly, the recorded statements petitioner sought to introduce did not fall within

18   the purview of the Confrontation Clause's prohibition.

19        Petitioner argues further that the trial court's evidentiary ruling violated the Confrontation

20   Clause because the prosecution was permitted to introduce out-of-court statements that petitioner

21   made later under interrogation by investigators.  Petitioner asserts that the trial court's refusal to

22   allow petitioner to use the full recorded statement to rebut these later statements given to

23   investigators effectively kept petitioner from cross-examining the later statements because

24   petitioner never testified at trial.  Petitioner argues that this effectively made him a witness

25   against himself.   This argument is frivolous.  Even assuming for the sake of argument that the

26   statements proffered by the prosecution fell under the Confrontation Clause, petitioner in no way

27   demonstrates how the inability to introduce the entire recorded statement could be construed as a

28   restriction on petitioner's ability to "cross-examine" those statements.  Accordingly, the

19

1   petitioner's Confrontation Clause claim should be denied.

2       B.      Admission of Expert Testimony Concerning a Firearms Course Petitioner

3               Attended

4       Second, petitioner argues that the state trial court's failure to strike the testimony of Joe

5   Dirickx, one of the prosecution's expert witnesses who taught a concealed weapon certification

6   course attended by petitioner in July of 2009, violated petitioner's constitutional right to due

7   process.  Petitioner asserts that this witness's testimony "included an instruction on the asserted

8   duty to retreat" that "purported [to] reflect[ ] California law," but which "actually contradicted

9   California law, which posits no duty to retreat."  Ptn. at 59.   Petitioner argues that this testimony

10  contradicted the trial court's instruction to the jury that there was no duty to retreat before using

11  lethal force under California law and that this conflict misled the jury regarding the legal

12  standards for self-defense under California law.

13      1.      State Court Decision

14      In determining that the trial court did not commit prejudicial error in failing to strike Joe

15  Dirickx's testimony from the record, the Third Appellate District wrote:

16      Defendant Forfeited His Claim That the Trial Court Erred in Failing to Strike the
17      Testimony of Joe Dirickx Concerning a Firearms Course Taken by Defendant, and
        in Any Event, Any Error Was Harmless

18

19      Defendant contends the trial court erred in failing to strike the testimony of
        Joe Dirickx who taught a concealed weapon "certification course" attended by
20      defendant in July 2009. Defendant asserts that Dirickx's testimony that the course
        "included instruction on the asserted duty to retreat," which is contrary to
21      California law, amounted to "conflicting instructions" and "created the likelihood
        that the jury instructions were subject to erroneous interpretation, in violation of
22      due process." As we shall explain, defendant forfeited his claim by failing to
        secure a ruling from the trial court on his motion to strike, and in any event, any
23      error was harmless.

24      Dirickx testified in pertinent part that his course included instruction on the
25      use of lethal force and self-defense, and that course attendees are provided with a
        number of written materials, including a publication from the California
26      Department of Justice, Firearms Division, on handgun safety. When the prosecutor
        asked Dirickx about one of the documents provided to class attendees, defense
27      counsel asked to approach. Following an unreported bench conference, the trial
        court admonished the jury as follows: "[I]t's the court's understanding that some of

28

20

the material that you may see or hear about here involves an issue of law. Please keep in mind that at the end of the trial I will address you on the law and give you the law so that if anything you hear about the law during this proceeding here from any other source other than the court differs from what I give you at the end of the trial, you have to disregard that part you hear here and follow the law as I give it to you."

The prosecutor then showed Dirickx and the jury a page from the California Department of Justice publication on firearm safety and drew their attention to a section entitled, "The Use of Lethal Force in Self–Defense." When asked how that section of the publication is used in his course, Dirickx explained that he "[e]xpand[s] on it" by "instruct[ing] everyone that in a situation their first line of defense, if at all available, is to retreat, to run, that lethal force can only be used when there's no other option open to you and for the protection of life and life only." Defense counsel objected on the ground that Dirickx's testimony was at odds with California law. The trial court sustained the objection and admonished the jury, "[T]his witness is testifying as to what he teaches, and you'll get the law later, as I said before."

Shortly thereafter, the prosecutor sought to question Dirickx about a document entitled, "Five Rules for Concealed Carry," which stated, among other things, "If you can run away ... RUN!" Another bench conference ensued, during which defense counsel objected to the use of the document on the ground it was inconsistent with California law and could thus mislead the jury. The trial court agreed, and sustained the objection. Thereafter, defense counsel moved to strike Dirickx's entire testimony as irrelevant.

Meanwhile, the prosecutor requested a short recess to determine how to proceed, and the court granted the request. When the prosecutor returned, Dirickx retook the stand, and the prosecutor indicated he had no further questions. Defendant declined to cross-examine Dirickx, and the trial proceeded without the court ruling on defendant's motion to strike.

After the close of evidence, the trial court formally instructed the jury on the law of self-defense, including the following: "A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating."

As a preliminary matter, we agree with the People that it was up to defendant to secure a ruling on his motion to exclude Dirickx's testimony in its entirety, and that by failing to do so, defendant forfeited the issue on appeal. (*See People v. Brewer* (2000) 81 Cal.App.4th 442, 461 ["We follow the long-established rule that where a court, through inadvertence or neglect, neither rules nor reserves its ruling, the party who objected or made the motion must make an effort to have the court actually rule, and that when the point is not pressed and is forgotten the party will be deemed to have waived or abandoned the point and may

21

1    not raise the issue on appeal"].)

2           Even assuming for argument's sake that defendant did not forfeit his claim,
3    we find that any error in failing to strike Dirickx's testimony was harmless. In the
     absence of evidence to the contrary, we presume the jury understood and followed
4    the court's admonition to disregard any material or testimony that conflicted with
     the law as instructed by the court. (*People v. Burgener* (2003) 29 Cal.4th 833, 870;
5    *People v. Waidla* (2000) 22 Cal.4th 690, 725.) Because nothing in the record
     suggests the jury did not understand or follow the court's admonition or
6    instructions, we reject defendant's assertion that the jury was confused by the
7    challenged testimony and believed that defendant had a duty to retreat.

8    Lod. Doc. 20 at 9-12, also at <u>People v. Zimmerman</u>, 2013 WL 870647 (Cal. App. 3 Dist. March

9    11, 2013).

10          2.     <u>Discussion</u>

11                 a.     <u>Procedural Default</u>

12          Respondent argues that petitioner's due process claim regarding the trial court's failure to

13   strike Dirickx's testimony is procedurally defaulted and, therefore, cannot be considered by this

14   court because the California Court of Appeal denied this claim on the determination that

15   petitioner failed to secure a ruling on his motion to strike this testimony in the trial court,

16   therefore forfeiting the issue on appeal.  Indeed, under California law, a party effectively

17   abandons a motion by failing to press the trial court to rule on it even when the trial court,

18   through inadvertence or neglect, neither rules nor reserves its ruling on the motion.  <u>People v.</u>

19   <u>Brewer</u>, 81 Cal.App.4th 442, 461 (Cal. Ct. App. 2000) ("[W]here a court, through inadvertence or

20   neglect, neither rules nor reserves its ruling, the party who objected or made the motion must

21   make an effort to have the court actually rule, and that when the point is not pressed and is

22   forgotten the party will be deemed to have waived or abandoned the point.").  This procedural

23   rule has been consistently applied by California's courts.  <u>See, e.g.</u>, <u>People v. Jones</u>, 210 Cal.

24   App. 4th 355, 361-62 (Cal. Ct. App. 2012) (defendant abandoned motion by failing to bring it to

25   the court's attention where the court inadvertently failed to rule on it due to multiple

26   continuances); <u>Brewer</u>, 81 Cal.App.4th at 461; <u>People v. Skaggs</u>, 44 Cal. App. 4th 1, 7-8 (Cal. Ct.

27   App. 1996) ("By failing to request [a ruling on a motion] and never raising the issue again, [the

28   defendant] abandoned the motion he now claims he made.").  Accordingly, petitioner's claim

1   regarding the trial court's failure to strike Dirickx's testimony has been procedurally defaulted.

2   Petitioner does not provide any argument showing "cause" and "prejudice" for the default of this

3   claim.  Therefore, this claim should be denied on the basis of procedural default.

4           b.      On the Merits

5           Moreover even if petitioner's claim was not procedurally defaulted, he fails to show that

6   the state appeals court's decision was contrary to, or based on an unreasonable application of,

7   clearly established federal law for the reasons discussed below.

8           A challenge to jury instructions does not generally state a federal constitutional claim.

9   See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107,

10  119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  Habeas corpus is

11  unavailable for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d

12  at 1085; see also Hayes v. Woodford, 301 F.3d 1054, 1086 (9th Cir. 2002); Lincoln v. Sunn, 807

13  F.2d 805, 814 (9th Cir. 1987).  However, a "claim of error based upon a right not specifically

14  guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief

15  where its impact so infects the entire trial that the resulting conviction violates the defendant's

16  right to due process."  Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v.

17  Crist, 616 F.2d 1107 (9th Cir. 1980)).  See also Prantil v. California, 843 F.2d 314, 317 (9th Cir.

18  1988) (stating that to prevail on such a claim petitioner must demonstrate that an erroneous

19  instruction "so infected the entire trial that the resulting conviction violates due process.").  The

20  analysis for determining whether a trial is "so infected with unfairness" as to rise to the level of a

21  due process violation is similar to the analysis used in determining whether an error had "a

22  substantial and injurious effect" on the outcome of the trial.  See McKinney v. Rees, 993 F.2d

23  1378, 1385 (9th Cir. 1993).

24          In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely

25  'undesirable, erroneous, or even universally condemned,' but must violate some due process right

26  guaranteed by the fourteenth amendment."  Prantil, 843 F.2d at 317 (quoting Cupp v. Naughten,

27  414 U.S. 141, 146 (1973)).  In making its determination, this court must evaluate the challenged

28  jury instructions "'in the context of the overall charge to the jury as a component of the entire trial

23

1     process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

2     1984)).  The United States Supreme Court has cautioned that "not every ambiguity,

3     inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."

4     Middleton v. McNeil, 541 U.S. 433, 437 (2004).  Further, in reviewing an allegedly ambiguous

5     instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has

6     applied the challenged instruction in a way' that violates the Constitution."  Estelle, 502 U.S. at

7     72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)); see also United States v. Smith, 520

8     F.3d 1097, 1102 (9th Cir. 2008).

9        Here, the California Court of Appeal determined that "[b]ecause nothing in the record

10    suggests the jury did not understand or follow the court's admonition or instructions [regarding

11    there being no duty to retreat], we reject defendant's assertion that the jury was confused by the

12    challenged testimony and believed that defendant had a duty to retreat."  Lod. Doc. 20 at 12.

13    Indeed, the record clearly shows that, during Dirickx's testimony, the trial court admonished the

14    jury to consider only the law the court instructed them on at the end of trial, which included the

15    correct instruction regarding the lack of a duty to retreat, and to disregard any other statements of

16    law heard that differed from those instructions.  Lod. Doc. 11 at 1437.  Furthermore, petitioner

17    fails to point to anything in the record that would indicate that there was a reasonable likelihood

18    that the failure to strike Dirickx's testimony confused the jury on the state of the law to the extent

19    that it "so infected the entire trial that the resulting conviction violate[d] due process."  Prantil,

20    843 F.2d at 317; see also Estelle, 502 U.S. at 72.  Accordingly, petitioner's claim that the state

21    court violated his right to due process by failing to strike Dirickx's testimony from the record

22    should also be denied on the merits.

23        C.     Failure to Give Jury Instructions on the Right to Defend Property

24        Third, petitioner argues that the trial court failed to *sua sponte* instruct the jury on the right

25    to defend real or personal property, which petitioner claims violated his Sixth and Fourteenth

26    Amendment rights to adequate instructions on a defense.  In particular, petitioner asserts that the

27    factual circumstances presented at trial regarding the victim's use of a tractor to enter onto

28    petitioner's property and smash his gate and defense counsel's argument at trial that petitioner

"had every right to prevent further acts of destruction to the property" gave rise to a duty by the trial court to *sua sponte* instruct the jury on the law regarding defense of property.  ECF No. 17 at 14.

### 1.    State Court Decision

In determining that the trial court did not commit prejudicial error in failing to *sua sponte* instruct the jury on the right to defend real or personal property, the Third Appellate District wrote:

> The Trial Court Did Not Err in Failing to Sua Sponte Instruct the Jury on Defense of Property

> Defendant next contends the trial court erred in failing to sua sponte instruct the jury in the language of CALCRIM No. 3476, which states that the owner or possessor of real or personal property may use reasonable force to protect that property from imminent harm. We disagree.

> It is well settled that a defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense if the defendant is relying on it or there is substantial evidence supporting it and it is not inconsistent with the defendant's theory of the case. (*People v. Anderson* (2011) 51 Cal.4th 989, 996–997.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt....' [Citations.]" (*People v. Salas* (2006) 37 Cal.4th 967, 982–983.) Thus, whether the trial court in this case erred in not instructing the jury on defendant's right to defend his property turns on whether defendant was relying on that theory or offered substantial evidence that, if believed by the jury, would raise a reasonable doubt as to whether O'Sullivan's homicide was justified. As we shall explain, defendant was not relying on such a defense, and there is no substantial evidence to support it.

> The defense argued defendant's use of force was justified because defendant himself, not his property, was in imminent danger of being hurt or killed. During closing arguments, defendant's trial counsel argued, in pertinent part: "What would your reaction be watching your feet get run over by that little tractor, after you just got hit by your long-time nemesis on your own property? Would you fear for your life? Knowing he could actually use that tractor to go after you some more? Would you fear for your life? Would you believe you had every right now to protect yourself? Of course you would. There's no doubt about it. And that's what he did. And he raised the weapon and he pointed it at Mr. O'Sullivan and he squeezed off what he thought were two shots. We now know there were three shots. And then he ran back in his house and he called 911."

1

2

As defendant notes, his trial counsel later argued defendant "had every right to prevent *further* acts of destruction to the property." (Italics added.) That argument, however, was made in reference to defendant's actions after he fired at O'Sullivan. Defendant's trial counsel was attempting to explain why defendant told the 911 operator, "I'm going to go after him right now," if defendant had already shot O'Sullivan. In doing so, counsel asserted that defendant "didn't know if John O'Sullivan was alive or injured.... He didn't know where John O'Sullivan was. He didn't know if John O'Sullivan might make further attempts to vandalize his property.... [¶] At that point [defendant] had every right to go back out and confront John O'Sullivan.... He had every right to prevent further acts of destruction to the property." Defendant's trial counsel never argued that defendant fired at O'Sullivan to protect his property from imminent harm.

3

4

5

6

7

8

In addition, the record does not support a finding that defendant used reasonable force against O'Sullivan to protect his property. Defendant intentionally fired three shots, all of which struck O'Sullivan somewhere in his torso. No juror reasonably could conclude such force was reasonable under the circumstances. (*See People v. Curtis* (1994) 30 Cal.App.4th 1337, 1360 ["the intentional use of deadly force merely to protect property is never reasonable"].)

9

10

11

12

In his reply brief, defendant argues for the first time that his conviction for second degree murder leaves open the possibility that the jury may have found that the shots he fired were "warning shots in O'Sullivan's direction, an 'intentional act,' knowingly committed with 'conscious disregard for human life,' whose natural and [probable] consequences were dangerous to human life." He then appears to suggest that the jury could have found that the firing of warning shots constituted reasonable force in defense of property, had the jury been so instructed. "It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (*People v. Tully* (2012) 54 Cal.4th 952, 1075.) In any event, defendant's argument is absurd. The only evidence is that defendant fired three shots, all of which struck Sullivan in various parts of his torso, and any one of which "would have been easily fatal in and of itself." When asked where he was aiming when he fired the shots, defendant said, "Just at him. Just at him." On this record, no juror reasonably could find that the shots fired by defendant were warning shots.

13

14

15

16

17

18

19

20

21

22

Lod. Doc. 20 at 12-14, also at <u>People v. Zimmerman</u>, 2013 WL 870647 (Cal. App. 3 Dist. March

23

11, 2013).

24

    2.   <u>Discussion</u>

25

        a.   <u>Procedural Default</u>

26

As an initial matter respondent argues that this claim is procedurally defaulted to the

27

extent that it is premised on petitioner's arguments that the record provided a possibility that

28

petitioner fired "warning shots" at the victim because, as the California Court of Appeal

1   determined in its opinion, petitioner raised this argument for the first time in his reply brief on

2   appeal.  As discussed above with regard to petitioner's right to remain silent claim, a state court's

3   dismissal of a claim because it was raised for the first time in the reply brief on appeal constitutes

4   a decision based on adequate and independent state procedural law.  Tully, 54 Cal. 4th at 1075.

5   Accordingly, petitioner's claim is procedurally defaulted to the extent it is premised on this

6   argument.

7                       b.      On the Merits

8           With regard to the remainder of petitioner's claim, a defect regarding jury instructions

9   rises to the level of a constitutional violation only when it "so infect[s] the entire trial that the

10  resulting conviction violates due process."  Estelle v. McGuire, 502 U.S. at 72.  Furthermore,

11  where the constitutional challenge is to a refusal or failure to give an instruction, the petitioner's

12  burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely

13  to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977);

14  see also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).  The burden upon petitioner is

15  greater yet in a situation where he claims that the trial court did not give an instruction *sua sponte*.

16          Here, petitioner fails to establish that the California Court of Appeal's analysis of this

17  claim was contrary to clearly established federal law.  While petitioner is correct that "[w]hen

18  habeas is sought under 28 U.S.C. § 2254, [f]ailure to instruct on the defense theory of the case is

19  reversible error if the theory is legally sound and evidence in the case makes it applicable," Clark

20  v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (internal quotation marks omitted), the California

21  Court of Appeal reasonably determined that petitioner did not assert such a defense at trial.  See

22  Lod. Doc. 20 at 13 ("[T]rial counsel later argued defendant "had every right to prevent *further*

23  acts of destruction to the property.' . . . That argument, however, was made in reference to

24  defendant's actions after he fired at O'Sullivan. . . .  Defendant's trial counsel never argued that

25  defendant fired at O'Sullivan to protect his property from imminent harm." (emphasis in

26  original)).  More importantly, even assuming that defendant had clearly asserted defense of

27  property as defense to shooting the victim, a failure to instruct on that defense would not have

28  constituted reversible error because, as the state appeals court reasonably determined, this defense

theory would not have been legally sound.  The factual record demonstrates that no reasonable

juror could find that petitioner used reasonable force to protect his property from imminent harm

because he used lethal force, i.e., he fired three independently fatal shots into the victim's torso,

which was per se unreasonable for purposes of a defense of property theory under California law.

See People v. Curtis, 30 Cal.App.4th 1337, 1360 (1994) ("[T]he intentional use of deadly force

merely to protect property is never reasonable.").  For this same reason, it cannot be said that a

failure to give a defense of property instruction "so infected the entire trial that [petitioner's]

resulting conviction violate[d] due process" because no reasonable juror could have found

petitioner not guilty under this theory.  Estelle v. McGuire, 502 U.S. at 72.  Accordingly,

petitioner's claim that the trial court violated his constitutional rights by not *sua sponte* giving the

jury a defense of property instruction should be denied.

> D.      Admission of Expert Testimony Regarding the Absence of Gunshot Residue

Fourth, petitioner claims that the trial court violated his constitutional right to due process

by admitting expert opinion testimony regarding the fact that petitioner's arms and hands had no

gunshot residue after the shooting incident.  Petitioner argues that this testimony suggested that

petitioner attempted to hide evidence and fabricate his version of the events, therefore indicating

that he had a consciousness of guilt, even though there was no evidence that petitioner attempted

to wash his hands or otherwise remove any gunshot residue in the time between when he fired the

fatal shots and when he was examined for residue.

> 1.      State Court Decision

In determining that the trial court did not commit prejudicial error in permitting a

prosecution expert witness to testify concerning the absence of gunshot residue on petitioner's

hands, the Third Appellate District wrote:

> The Trial Court Did Not Err in Allowing an Expert to Testify Concerning the
> Absence of Gunshot Residue on Defendant's Hands
>
> Defendant next contends that "[t]he trial court erroneously permitted expert
> opinion testimony that [he] might have deliberately removed gunshot residue in
> the short interval between his 911 call and the police response" because "there was
> no evidence of handwashing." Defendant forfeited this claim by failing to object to

the admission of the challenged evidence in the trial court, and in any event, this argument is frivolous.

At trial, Kaleuati, an expert in gunshot residue analysis, testified that she examined samples taken from defendant's hands, and there were no particles of gunshot residue found on the samples. The prosecutor then asked Kaleuati whether she would expect to find gun residue on the hands of an individual who had fired a .25–caliber Raven (the type of gun defendant used to shoot O'Sullivan), and defendant's trial counsel objected on the ground the question lacked foundation. The trial court allowed defendant's trial counsel to voir dire Kaleuati, and thereafter, counsel argued that while Kaleuati "may have what I would describe as generalized knowledge based on her experience and the literature, ... she's got no specific experience with a Raven Arms .25 [-caliber]...." The trial court sustained the objection, finding that "although the witness may be qualified in a number of areas, that is not sufficient qualification with respect to experience or education on this particular type of firearm to express an opinion as requested by that last question of the People." Thereafter, the prosecutor asked Kaleuati, "And can you tell us again, assuming that [defendant], in fact, fired a *weapon*, what the reasons would be that you would not find gunshot residue." (Italics added.) Kaleuati answered, without objection, "In general, if you do not find gunshot residue, there are a couple of possibilities. One is that the person may have wiped their hands and removed the gunshot residue onto another surface. The person may have washed their hands and removed the gunshot residue just through friction reaction, friction action. [¶] ... Or the person may not have discharged a firearm." During cross-examination, Kaleuati confirmed that gunshot residue could be removed during normal activity.

Defendant argues the trial court erred in "permitt[ing] the testimony of [Kaleuati] which indicated that [defendant] may have destroyed evidence by washing his hands or otherwise removing [gunshot residue] from his hands and arms" because there was no foundation for such a conclusion. Defendant contends the error was prejudicial because it contributed to the prosecution's theory that defendant "made up a story and hid or concealed evidence, demonstrating a consciousness of guilt." There are several problems with defendant's argument.

First, defendant forfeited the argument by failing to object in the trial court. He objected when the prosecutor asked Kaleuati if she would expect to find gunshot residue on the hands of someone who fired a .25–caliber Raven, and the objection was sustained. He did not, however, object when the prosecutor subsequently questioned Kaleuati about the reasons she might not find gunshot residue on defendant's hands even though he had fired "a weapon." By failing to object, defendant forfeited the issue on appeal. (*People v. Booker* (2011) 51 Cal.4th 141, 170 [failure to object to the admission of evidence in the trial court forfeits the issue on appeal].)

Second, even assuming defendant preserved the issue for appeal, Kaleuati did not conclude that defendant washed his hands, as defendant seems to suggest. Rather, she testified as to the possible reasons why gunshot residue was not found

1    on defendant's hands even though he admitted firing a weapon, including that it
2    may have rubbed off during normal activity.

3        Finally, contrary to defendant's assertion, the absence of gunshot residue
     coupled with defendant's admission that he fired three shots provides some
4    evidence from which the jury reasonably could infer that defendant took steps to
     remove gunshot residue from his hands. While there may be another explanation
5    for the absence of any gunshot residue, there was some evidence to support a
     finding that he took steps to remove it, as argued by the prosecution. Accordingly,
6    even if the issue was preserved on appeal, the trial court did not err in admitting
     the challenged testimony.
7

8    Lod. Doc. 20 at 14-16, also at <u>People v. Zimmerman</u>, 2013 WL 870647 (Cal. App. 3 Dist. March

9    11, 2013).

10            2.    Discussion

11                a.    Procedural Default

12        As an initial matter, respondent argues that this claim is procedurally defaulted because

13   the California Court of Appeal denied this claim on procedural grounds on the basis that

14   petitioner's trial counsel failed to raise a spontaneous objection to the introduction of the

15   challenged expert witness's testimony at trial.  However, the record shows that petitioner's trial

16   counsel did object to the expert's testimony, which was sustained by the trial court, albeit with

17   regard to that witness's expert status.  Generally, "California courts construe broadly the

18   sufficiency of objections that preserve appellate review."  <u>Melendez v. Pliler</u>, 288 F.3d 1120,

19   1125 (9th Cir. 2002); <u>see also</u> <u>People v. Scott</u>, 21 Cal.3d 284, 290 (1978) ("In a criminal case, the

20   objection will be deemed preserved if, despite inadequate phrasing, the record shows that the

21   court understood the issue presented.").  Furthermore, while the California Court of Appeal

22   indicated that petitioner forfeited his claim due to trial counsel's failure to spontaneously object at

23   trial on the specific grounds he asserted on appeal, it also adjudicated this claim on the merits.

24   Accordingly, given the often lengthy and complicated matter of procedural default, especially

25   considering the complex issue regarding whether the procedural rule cited by the California Court

26   of Appeal is consistently applied in the factual context provided by this case and the broad

27   construction California courts may give to such an objection, it appears that the interests of

28

1    judicial economy counsel in favor of reaching the merits of this claim.  See Franklin v. Johnson,

2    290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex

3    than the merits issues presented by the appeal, so it may well make sense in some instances to

4    proceed to the merits if the result will be the same."); Lambrix v. Singletary, 520 U.S. 518, 525

5    (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved

6    first; only that it ordinarily should be.")  As discussed below, petitioner's claim as to the

7    admission of this expert testimony is without merit.  Therefore, an analysis of the merits of this

8    claim appears less complicated and time-consuming than a lengthy discussion regarding whether

9    the procedural bar cited by the California Court of Appeals has been consistently applied in the

10   context presented by this case.

11                              b.      On the Merits

12           With regard to the merits of this claim, petitioner fails to show that the California Appeals

13   Court's decision was contrary to clearly established federal law.  Indeed, the Ninth Circuit Court

14   of Appeals has held that there is no clearly established right to be free of an expert opinion on an

15   ultimate issue.  Moses v. Payne, 555 F.3d 742, 761 (9th Cir.2009) ("[It is well-established . . . that

16   expert testimony concerning an ultimate issue is not per se improper. . . .  Although "[a] witness

17   is not permitted to give a direct opinion about the defendant's guilt or innocence . . . . an expert

18   may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact."

19   (internal citations and quotation marks omitted)).  Here, the weapons expert gave an opinion as to

20   the possible reasons petitioner's arms and hands had no gunshot residue after petitioner fired his

21   gun at the victim, including the possibility that any residue was wiped off through normal

22   activity.  This opinion did not pass directly upon petitioner's guilt or innocence.  In fact, it even

23   left the ultimate factual issue of why no gunshot residue was found on petitioner's arms and

24   hands up to the jurors.  Petitioner cannot demonstrate that the California Appeals Court's decision

25   to uphold the introduction of this evidence was contrary to clearly established law.  Therefore,

26   this claim should be denied.

27   /////

28   /////

E.     Jury Instructions that Hiding Evidence or Giving False or Misleading Statements

Could be Considered as Evidence of Consciousness of Guilt

Finally, petitioner argues that the trial court committed prejudicial error when it used the language of CALCRIM numbers 362 and 371 to instruct the jury that the hiding of evidence or giving of false or misleading statements could be considered as evidence of consciousness of guilt.

1.     State Court Decision

In determining that the trial court did not commit prejudicial error by instructing the jury that consciousness of guilt could be inferred from hiding evidence or making false or misleading statements, the Third Appellate District wrote:

> The Trial Court Did Not Err in Instructing the Jury in the Language of CALCRIM Nos. 371 or 362, and Any Potential Error Was Harmless
>
> Defendant next contends that the trial court prejudicially erred in instructing the jurors in the language of CALCRIM Nos. 371 and 362, which provides that consciousness of guilt may be inferred from hiding evidence or making false or misleading statements. We disagree and find that any potential error was harmless.
>
> The court instructed the jury in the language of CALCRIM No. 371 as follows: "If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."
>
> The court similarly instructed the jury in the language of CALCRIM No. 362 as follows: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." Defendant did not object to either instruction.
>
> "Generally, a party may not complain on appeal about a given instruction that was correct in law and responsive to the evidence unless the party made an appropriate objection. [Citation.] But we may review any instruction which affects the defendant's 'substantial rights,' with or without a trial objection. (Pen. Code, § 1259.) 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the

32

claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) Defendant does not contend either instruction was incorrect in law; rather, he asserts that neither was supported by the evidence. He is mistaken.

"When testimony is properly admitted from which an inference of a consciousness of guilt may be drawn, the court has a duty to instruct on the proper method to analyze the testimony." (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1104.) Here, there was evidence from which the jury reasonably could conclude that defendant attempted to hide evidence and made false or misleading statements. For example, defendant told the 911 dispatcher and Sergeant Middleton that his glasses were broken during the altercation with O'Sullivan; however, Middleton testified that defendant's glasses were not damaged. Defendant said O'Sullivan ran over his feet with the tractor tires; however, the triage nurse testified the injuries to defendant's feet were inconsistent with being crushed, and the emergency room doctor testified that while it was conceivable defendant's foot had been run over by a tractor, the doctor was "underwhelmed" by the extent of defendant's injuries. No gunshot residue was found on defendant's hands and his finger prints were not found on the handgun even though he admitted firing the handgun earlier that evening, and two of the three shell casings were missing from the scene. While not critical to the prosecution's case, such evidence was related to the crimes defendant was charged with committing.

Even assuming for argument's sake that the instructions were not supported by the evidence, any error was harmless under any standard. The challenged instructions left it up to the jury to determine whether defendant had tried to hide evidence or made false or misleading statements. The instructions further advised the jury that even if they found that defendant had tried to hide evidence or made false or misleading statements, they could not convict him on that basis alone. The jury also was instructed that some instructions may not apply, and it should not assume that the inclusion of an instruction suggested anything about the facts. Contrary to defendant's assertion, neither instruction lightened the prosecutor's burden of proof, even if erroneously given. (*See People v. Avila* (2009) 46 Cal.4th 680, 709 [addressing lack of prejudice stemming from giving of CALJIC No. 2.06 despite insufficient evidentiary basis therefore]; *see also People v. Williams* (2000) 79 Cal.App.4th 1157, 1166, fn. 8.) Significantly, our Supreme Court has held that "[t]he inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction." (*People v. Holloway* (2004) 33 Cal.4th 96, 142.) The challenged instructions, even if erroneously given, were harmless under any standard.

Lod. Doc. 20 at 16-18, also at <u>People v. Zimmerman</u>, 2013 WL 870647 (Cal. App. 3 Dist. March 11, 2013).

/////

1          2.    <u>Discussion</u>

2        As discussed above, a challenged jury instruction "cannot be merely 'undesirable,

3 erroneous, or even universally condemned,' but must violate some due process right guaranteed

4 by the fourteenth amendment." <u>Prantil</u>, 843 F.2d at 317.  Here, petitioner argues that these two

5 instructions on consciousness of guilt should not have been read to the jury because there was no

6 evidence that petitioner hid evidence or lied about the circumstances of the shooting.  Petitioner

7 asserts that these unnecessary instructions "became a springboard for prosecution speculation that

8 petitioner hid evidence as part of an effort to fabricate a false story" and that "[p]etitioner was

9 only convicted because the jury was persuaded that he lied about the circumstances of the

10 offense, and thereby disclosed a guilty mind and consciousness of guilt."  Ptn. at 64-65.

11 However, as the California Court of Appeal determined, there existed evidence from which the

12 jury reasonably could conclude that defendant attempted to hide evidence and made false or

13 misleading statements, including inconsistencies in petitioner's statements to the authorities, the

14 discovery of only two bullet casings at the crime scene despite the fact that petitioner had shot the

15 victim three times, and the lack of gunshot residue on petitioner's arms and hands after the

16 shooting.  Accordingly, contrary to petitioner's assertion, there was a sufficient basis for the trial

17 court to give the two jury instructions and the California Court of Appeal reasonably relied on

18 such evidence to deny petitioners' claim.

19        Furthermore, as the state appeals court noted, "[t]he challenged instructions left it up to

20 the jury to determine whether [petitioner] had tried to hide evidence or made false or misleading

21 statements" and the trial court admonished them that "they could not convict him on that basis

22 alone."  Lod. Doc. 20 at 18.  Given the lack of any indication that the jury did not follow this

23 admonition, or that the jury understood the instructions to mean that they were required to find

24 that petitioner had a consciousness of guilt, it cannot be said that the instructions "so infected the

25 entire trial that the resulting conviction violate[d] due process."  <u>Prantil</u>, 843 F.2d at 317.

26 Accordingly, the court recommends that petitioner's due process claims regarding the

27 consciousness of guilt instructions be denied.

28 /////

CONCLUSION

Based on the foregoing, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus (ECF No. 1) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 29, 2015

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

11.zimm1801.hc

35